Filed 5/18/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

THE PEOPLE,

     Plaintiff and Respondent,

v.

GREGORY HALL,

     Defendant and Appellant.

A147923

(Alameda County
Super. Ct. No. 172445)

## INTRODUCTION

A jury convicted defendant of first degree murder with personal use of a knife. (Pen. Code,[1] § 187, subd. (a), 12022, subd. (b)(1).) On appeal, defendant argues the trial court abused its discretion and violated his Fifth, Sixth, and Fourteenth Amendment rights by allowing his impeachment with the conduct underlying a misdemeanor conviction for possession of a weapon, in which he threatened a person with a large knife. We agree, and reverse the judgment of conviction.

## STATEMENT OF THE CASE

In September 2013, the Alameda County District Attorney filed an information charging defendant Gregory Hall with the first degree murder of Michael Bradley on or about June 14, 2012, a serious and violent felony. The information further alleged that defendant personally used a knife in the commission of the crime, that he had suffered two prior serious felony convictions, and that he was subject to the three strikes law.

---

[1] Unless otherwise indicated all further statutory references are to the Penal Code.

(§§ 187, subd. (a); 12022, subd. (b)(1); 667.5, subd. (c); 1192.7, subd. (c)(23); 667, subd. (a)(1); 667, subd. (e)(2)/1170.12, subd. (c)(2).)

In December 2015, a jury found defendant guilty of murder and found true the personal use of a knife allegation. After the jury was excused, defendant admitted the prior convictions.

In February 2016, the court struck the use allegation in the interests of justice (§ 1385) and sentenced defendant to 60 years to life in prison.

## STATEMENT OF FACTS

**Prosecution's Case**

### The Discovery of Michael Bradley's Body

On June 14, 2012, Diana Wilson, Michael Bradley's next door neighbor on Market Street in Oakland, noticed that Bradley's door was open and several of his tools were outside, even though it was raining. She had not seen Bradley for a few days and was concerned. Wilson, her daughter Franceska Nelson, her cousin Terry Jones, and Eugene Fritch went to check on Bradley. Jones discovered Bradley's decomposing body and called the police.

### The Crime Scene

When Oakland Police Sergeant Leonel Sanchez arrived at the scene, there was loud music playing inside the house and Bradley's body was lying on the bedroom floor with his feet sticking out into the hallway. There were masticated bits of almond on Bradley's neck and throat, and scattered about the body. At first, Sanchez thought Bradley had choked to death on an almond. However, Sanchez soon discovered Bradley had been stabbed several times. There was an electrical cord on the floor, and a blood trail from the bedroom to the kitchen. There was no evidence of a forced entry.

Sanchez interviewed several neighbors. Bradley rented the main floor of the house in which he was living, and German Aviar lived on the ground floor. Bradley's

landlord, Hector Orozco, told Sanchez the last time he saw Bradley was Sunday, June 10, 2012.

Wilson owned the house next door and lived there with her daughter and two tenants, her cousin Terry Jones and Eugene Fritch, who rented separate basement rooms. Defendant had previously rented the room in which Jones was then living, but he moved out two months before Bradley's death. According to Nelson, Bradley and defendant were friends who occasionally drank beer together. Defendant also helped Bradley with yardwork.

Sanchez searched Bradley's back yard and the back yards of several of Bradley's neighbors. He located a sleeveless vest near a fence between a neighbor's yard and a large apartment complex. The neighbor said he had noticed the jacket in his yard earlier and had thrown it over the fence because it did not belong to him. There was dried blood on the outside of the jacket and a black beanie with two cut-out eye holes and an orange sock with dried blood on it inside the vest pockets.

Sanchez searched Bradley's house and collected an empty beer can from the premises. Sanchez submitted the can, electrical cord, clothing, and fingernail clippings from Bradley's body to the crime lab for DNA examination.

### The Autopsy Findings

Dr. Thomas Beaver, the former chief forensic pathologist for Alameda County, performed the autopsy on Bradley. Dr. Beaver had retired and relocated to Florida prior to trial. Dr. Michael Ferenc, the current chief forensic pathologist for Alameda County, testified as an expert on autopsies and cause of death, based on Dr. Beaver's report. Bradley was 67 years old. A ligature mark on the neck was consistent with the cord found near the body. Also, cartilage in Bradley's larynx was broken.

Bradley had suffered 16 stab wounds. The largest wound was four inches long and could have been caused by a blade with a maximum width of three and one-half to four and one-half inches and a square edge. At least six of the stab wounds penetrated

3

Bradley's left chest wall. Based on Dr. Beaver's observations, Dr. Ferenc opined that the cause of death was multiple stab wounds to the chest involving the heart and lungs.

### DNA Evidence

The DNA from the collar of the vest was consistent with defendant's DNA. A bloodstain on the front of the jacket was consistent with Bradley's DNA. Biological matter on the underside of the black beanie near the eye holes matched defendant's DNA. Blood on the sock matched Bradley's DNA; defendant was a minor contributor of DNA on the sock. The DNA on the electrical cord matched Bradley's DNA. Minor alleles on the cord were consistent with defendant's DNA. Bradley's DNA only was on his fingernails.

### Defendant's Statement to Police

Defendant was arrested, Mirandized,[2] and interviewed on February 14, 2013. A recording of the interview was played for the jury.

Defendant said he was on SSI and lived on $800 a month, some of which he spent on alcohol and some of which he used to pay for motels on occasion to get off the streets. He was using the showers at City Team shelter.

Asked if he used drugs in the past, defendant said no. Asked later what his drug of choice was "back then," defendant admitted it was methamphetamine. Defendant explained that he worked "for a long time with bikers" at an R.V. dealership in San Leandro and they "used to . . . get me high on that just 'cause they know I be throwin' down every day when they be sittin' there watchin'. . . ." By "throwin' down" he meant "doin' most [of the] work"; he did not mean fighting.

Defendant said he was not familiar with the area around 33rd and Market Streets and, when shown a picture of Michael Bradley, said he had never seen Bradley before. Shown a picture Wilson's house on Market Street, defendant admitted that about a year

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

4

and a half earlier, he rented a room from "Diane" for $450 a month. He recalled that her cousin "Terry" and a person named "Eugene" lived there. Eugene had suffered several strokes and had a "mean streak." As for the house next door, defendant maintained that a Spanish couple with a child lived downstairs, hippies lived upstairs, and he never went inside.

Sergeant Sanchez advised defendant he was investigating Bradley's death. Defendant said, "I turned my life around a long time ago." Shown pictures of the vest, beanie, and sock, defendant denied they belonged to him. Defendant said he wanted to tell the police that Eugene was mean and violent and went to jail two or three weeks earlier for beating up a girl. Sanchez then asked defendant, "Who else is mean? Are you mean?" Defendant answered: "I don't like—I'm not into violence. I don't like people that's into violence and I ain't got no violent record at all. Period. Just because I ain't got no violent record don't mean that a person ain't violent because they . . . probably ain't got caught. But I know in my heart I don't like . . . violence. . . . I . . . don't like that. You know, uh—uh, when that guy killed all them little kids that bothered me for a whole—a long time. You know, I hate the evilness in people . . . . But, um, that's the world . . . the way of the world."

Sergeant Sanchez interviewed Mr. Fritch for about an hour on February 20, 2013. Mr. Fritch is "a little slow," but he was cooperative and answered questions about "[h]ow long he lived or first if he lived at the house next door, which he did; how long he did; if he knew Mr. Hall; and how and what he knew about Mr. Hall; and how he described him, both personal wise and character wise."

### *The Defense Case*

Defendant testified in his own behalf and denied killing Bradley. Defendant was 62 years old and homeless at the time of trial. When he was interviewed by police he had been living on the streets and at the City Team shelter in downtown Oakland for about

5

nine months. Before that, he lived in Diane Wilson's house next door to Bradley, whom he knew.

Defendant admitted on direct examination he had been convicted of two felonies in 1997 and 1999, both residential burglaries. He worked for some bikers in San Leandro around that time. The methamphetamine he used made him work harder than others, but it never made him feel violent.

The night Bradley was killed, defendant was living under the freeway near Market and 36th Streets. He was wearing the vest that was in evidence, and had the hat and sock in his pocket. The hat was for sleeping outdoors. He was lying to police when he said he did not know Bradley and had never been inside Bradley's house. He knew the police wanted to talk to him about Bradley's death as soon as they took him to the homicide area of the police department. He lied to police because he was "deterred by fear . . . [¶] . . . that I was at Michael's house on the night in question when he passed, and we were in the house and we were talking, and I was listening to his stereo." Specifically, he was afraid of retribution.

The last time he saw Bradley alive was at 9:00 p.m. on the night he died. He was visiting Bradley, whom he considered a friend. While he was there, some people called to Bradley through the window. Defendant saw two people—one tall and muscular, and one short—and heard a female voice. The tall one reminded him of Eugene Fritch. Bradley asked defendant if he wanted to "hang out with him and his company," meaning the two people outside. When defendant said no, Bradley invited him to wait out in the detached back house on his property, since the company would probably not stay long. Bradley escorted him to the back house and then left. The radio was on.[3]

_____

[3] At this point in defendant's testimony, the court announced the noon recess, during which time the court ruled, over defense counsel's objection, that defendant could be impeached with the facts underlying a 2010 misdemeanor conviction for knife possession.

6

Defendant fell asleep. He awoke at dawn. Although there was a brand new toilet in the back house, he never used it. Defendant went back to Bradley's house to tell him he was leaving. The door was open a crack, so defendant pushed it open and saw a cord on the floor and picked it up. He walked further into the house and saw Bradley's feet. He dropped the cord and knelt down near Bradley's head. Bradley's face was bloody. Defendant took a washcloth and an orange sock out of his pocket and used them to compress Bradley's face where there was the most blood. He listened for a pulse or heartbeat in Bradley's chest, and then put his ear against Bradley's mouth, but did not hear any breathing or find a pulse. Once he realized Bradley was dead, defendant's mind turned to the company from the night before and he became paranoid that they might have seen and recognized him as being there. He felt threatened being there. All he could hear was the music and could not tell if anyone else was still in the house. He ran out of the house via the back stairs and through the yard, towards the large apartment building.

At the time, defendant had a catheter attached to a urine bag strapped to his leg. It was really full and he emptied it near the front yard of the apartment building. He took off his vest because it was getting in the way while he emptied the bag, and he forgot to take it with him when he left the area. He never returned to Bradley's house, and he did not report Bradley's death to the police because he was afraid the people who had visited Bradley would recognize him and take some sort of action against him.

Defendant admitted he had one misdemeanor conviction in 2010 for carrying a concealed knife. He believed a young man at the Fruitvale BART station accused him of brandishing a knife at him, but he did not come forward to press charges. Nevertheless, defendant accepted responsibility and entered a plea to possession of the knife. He cooperated with the police and told them he had pulled his coat to the side and exposed the knife. He never removed the knife from his coat or waistband. It was in a holster. On cross-examination, defendant described the knife as a 10- or 12-inch-long butcher

knife. He said he had just bought it at the Coliseum flea market to cut bushes or shrubs away from his camp area. Defendant explained the young man had gone through the turnstile with defendant without paying his fare. On the escalator, defendant asked the man why he did that. The man stared at him in an aggressive manner. Defendant said, "[Y]ou don't want to know what I'm going to do to you if you don't stop staring at me." The prosecutor had defendant identify a color photograph of the knife, presumably to contradict defendant's description of it, and published the photograph to the jury. The photograph was admitted into evidence.[4]

At the time he was interviewed by the police, defendant did not know there was DNA evidence linking him to the clothing items recovered by police.

### Rebuttal

Eugene Fritch had suffered five strokes, one recently, and it was difficult for him to speak. He denied killing Bradley.

Sergeant Sanchez was familiar with the distinct smell of human urine and did not detect even a faint smell of human urine in the area where he investigated and found the vest.

The knife with which Bradley was killed was never introduced into evidence.

## DISCUSSION

### Abuse of Discretion in Allowing Impeachment with Misdemeanor Conduct

Defendant argues the court's mid-testimony ruling that he could be impeached with the facts of his 2010 misdemeanor conviction was an abuse of discretion and violated his right to a fair trial under the Fifth, Sixth, and Fourteenth Amendments. Defendant's arguments require that we set forth the background for the court's ruling in some detail.

---

[4] The photograph itself is not part of the record on appeal.

8

## Background Facts

Prior to trial, on November 30, 2015, the prosecutor filed an in limine motion seeking to impeach defendant with (1) the fact of his two felony convictions for first degree burglary "should [defendant] elect to testify at trial" and (2) the underlying facts of the felonies and of a misdemeanor conviction "with evidence that he is known to regularly carry knives" in the event defendant were to " 'open the door' " during his testimony. The prosecutor professed not to seek to use these convictions for Evidence Code section 1101, subdivision (b) purposes, as the district attorney conceded "their probative value is likely substantially outweighed by their prejudicial effect given the issues in this case." He reiterated that position at a hearing on the in limine motions held the same day. However, the prosecutor said he "would seek to explore those areas were the defendant to testify, were he to open the door about weapons, violence, et cetera." The court reserved ruling on the matter until such time as "we're able to determine if the defendant testifies. And then prior to his testimony, you can make your offer of proof at that point."

After the prosecution rested, the court took up the matter of impeachment with "the misdemeanor conviction for [section] 12020[, subdivision] (a)(4) for carrying a dirk or dagger." Defense counsel argued a violation of section 12020, subdivision (a)(4) is not a crime of moral turpitude. The court disagreed, citing two cases. The court added: "Now, on the other hand, under [Evidence Code section] 352, *I'm not going to allow that* [*section*] *12020 to be used, because I think that here they are getting too similar given the knife wounds to the incident offense, and that the jury might be misled by it.* But it seems to me that that conviction should be taken into consideration as to whether Mr. Hall has led a blameless life since being released from prison, and that conviction which is relatively recent denotes otherwise, which can go towards argument that the prior felony convictions *given their dissimilarity* should be admitted." (Italics added.) The court

9

concluded: "Well, *I'm not going to be using it for impeachment,* but I am going to take it into consideration as to whether the burglary should be used to impeach." (Italics added.)

The prosecutor, however, continued to argue that if defendant testified, both the felonies *and* the misdemeanor should be admitted because defendant told the police "he's not into violence; he doesn't like people that are into violence; he doesn't have a violent record at all. . . . [¶] The 2010 conviction regarding the brandishing of a knife, in that case, Mr. Hall brandishes a knife at the civilian. And he tells that person, 'you don't know what I'm going to do with this if you don't stop looking at me.' Those are the facts underlying the case. And I just don't see how, if Mr. Hall testifies, he's already made a statement in his February 2013 interview with the police that he's not a violent person, that's not him; he didn't have a violent record. I think it is entirely relevant for impeachment purposes to flesh out the fact that that is not true, with respect to that misdemeanor."

The prosecutor also argued that the two prior felonies were not "so dissimilar to the one at hand. [¶] In both of those cases, 1999 and 1997, the moment Mr. Hall is stopped the day of the burglary, he is in possession in one instance of a butcher knife under his waistband. And then in another instance, he's in possession of a large kitchen knife in his waistband. [¶] In 2010, when he's stopped, he's brandishing a knife that's 8 inches long with a fixed blade. This is a case where he's going into a man's home wearing a burglary mask or some sort of mask to conceal his identity. [¶] I'm not asking the Court to reconsider[] its rulings. I understand them, but I just wanted you to know that I don't think that it's dissimilar and that's if Mr. Hall were to testify. I'm not saying that it should influence that decision. It's his right [to testify], but I want to make sure that from the beginning I'm making myself clear, those are the areas that I intend to explore, depending on what doors are opened *aside from the statements that he's already made about not being a violent person.*" (Italics added.) The court responded: "Whether you try to go there and whether I allow it are two different questions."

10

Defense counsel argued that carrying a concealed weapon was not a violent crime because it was not listed in the Penal Code as a violent crime, and that defendant therefore "did not lie in that regard. He does not have any violent priors."

The court concluded: "*I'm going to wrestle with the question as to whether his statement . . . that he's a peaceful person allows the District Attorney to get into the facts underlying that particular crime*, because I think the facts alleged in the probable cause declaration anyway for that is that another individual was threatened with that knife— [¶] . . . [¶] . . .and didn't wish to press charges. [¶] All right. Anyway, *I'm going to rule that both prior felony convictions can be used to impeach. And I'll find that under* [*Evidence Code*] *section 352, that although the conviction for the misdemeanor* [*Penal Code section*] *12020*[*, subdivision*] *(a)(4) is a crime of moral turpitude, in my opinion that for credibility purposes, that its use is outweighed by the substantial degree of prejudice that Mr. Hall would suffer if it was used, which is not to say if Mr. Hall does testify, he better be careful about how he testifies with regard to his statement to the police that he's a peaceful person*." (Italics added.)

On direct examination, defense counsel asked defendant a series of questions about his statement to the police. Defendant was not specifically asked about his statement that he was not a violent person with a violent record. But he was asked about his statement that he used methamphetamine when he worked for some bikers in San Leandro in 1997 or 1998. Specifically, defendant was asked several questions about how methamphetamine made him feel, including the question, "As a result of using methamphetamine, do you ever recall of that making you feel violent?" Defendant responded, "No, sir."

Defendant admitted he had lied to police about not knowing Bradley, never having been inside Bradley's house, and never having seen the vest, hat, or sock in evidence. He also testified he knew the police wanted to talk to him about Bradley's death. Asked why he lied, defendant answered that he was "deterred by fear." Asked "fear of what,"

11

defendant testified he was in Bradley's house talking and listening to the stereo when Bradley "passed." Asked again, "What specifically were you afraid of," defendant testified, "In my mind was retribution." At that point, defendant did not specify the source of retribution.[5]

During the noon recess, the prosecutor renewed his motion to introduce defendant's misdemeanor conviction for carrying a concealed dirk or dagger upon his person, and the conduct underlying the conviction, either by defendant's own testimony or by rebuttal testimony, for impeachment purposes. Specifically, the prosecutor sought to introduce "the action that Mr. Hall did with the knife and the words that he used when he did that action." Defense counsel strenuously objected that the evidence was highly prejudicial and that defendant was being punished for being well behaved and pleasant on the stand "by having this brought in after he's made the choice to take the stand, and I think that's really trapped him in an unfair position. And, honestly, I think it's improper and I think it's wrong."

The court disagreed with defense counsel's recollection of its prior ruling. "Well, I don't think the decision was made after he took the stand. It was brought up yesterday at a time that the Court did not know whether or not he was going to take the stand. And as I stated to both counsel that in view of Mr. Hall's stating in his interview to the police that he was a peaceful person that I viewed it as relevant evidence of prior criminal conduct, relevant to the question of credibility, in the other words, that statement that he is a peaceful person, and that I would mull it over. [¶] Now, the fact that he has disavowed his statement to the police, I don't think by any means he has disavowed his statement to the police in its entirety, and I think that he would be getting a windfall were

---

[5] Defendant later testified he feared retribution from "[t]he people who visited [Bradley] on that night in question."

he allowed to prevent that testimony from coming about, limited only on the issue of his credibility."

Defense counsel argued that if the district attorney thought that defendant's statement to police might falsely portray him as a peaceful person, that portion of the statement should have been redacted, just as other parts had been redacted. The court observed it might well have redacted that portion of the statement if either side had asked for redaction, but both sides knew what was in the video, and yet they allowed it to be presented to the jury as it was. Defense counsel protested that he had been presented with a final redacted version of the video and transcript just before it was played in court and "there was no opportunity for me to sit down and view that video at length." The prosecutor disputed that timing, and argued he had e-mails showing counsel had proposed edits on December 6, 2015. The court observed if there was error in that regard, it was invited.[6]

Defense counsel also argued that his understanding of the court's prior ruling was that "should Mr. Hall take the stand and try to bolster his image of being a peaceful, nonviolent person in court, if he were to say something to open the door for that in court, that would trigger it, that it was him taking the stand and making further statements that would contradict or open the door for this highly prejudicial information to come in. . . . [¶] . . . [I]t was not that based on evidence everything that was already on the record that the ruling would come after my client took the stand. . . . [H]e hasn't done anything to contradict or anything to open the door today for this information."

The court disagreed. "Well, I think to some degree his testimony on the stand as to the reasons as to why he lied to the police, I believe he . . . stated, quote, 'I was

---

[6] The invited error doctrine bars appellate review of any error which trial counsel deliberately and consciously, as a matter of trial tactics, induced the trial court to make. (*People v. Cooper* (1991) 53 Cal.3d 771, 830–831.) We do not find invited error, and review defendant's claims on the merits.

deterred by fear.'  In other words, by fear of the police by knowing that he was being talked to by Homicide, all of which to me at least is giving an implication of one being a peaceful, nonaggressive person. . . .  [S]o on balance, the credibility of that impression, if you like, is justifiable evidence for the prosecution to adduce if the prosecution has it.  So my ruling will be that, as indicated, that misdemeanor conviction and conduct may be introduced."

### *Relevant Legal Principles*

We review the trial court's rulings admitting evidence of past criminal conduct for abuse of discretion.  (*People v. Wheeler* (1992) 4 Cal.4th 284, 293, 295, 296–297 (*Wheeler*); *People v. Foster* (2010) 50 Cal.4th 1301, 1328–1329.)  "Misdemeanor convictions . . . are not admissible for impeachment, although evidence of the underlying *conduct* may be admissible subject to the court's exercise of discretion."  (*People v. Chatman* (2006) 38 Cal.4th 344, 373.)  Misdemeanor misconduct involving moral turpitude may suggest a willingness to lie, which is relevant to the credibility of a witness or hearsay declarant (Evid. Code, § 210; *Wheeler*, at p. 295.)  Evidence of a misdemeanor conviction for possession of a concealed handgun reflects a crime of moral turpitude. (*People v. Robinson* (2005) 37 Cal.4th 592, 624, 626.)  Threatening to kill or seriously injure someone (§ 422) is also conduct involving moral turpitude.  (*People v. Thornton* (1992) 3 Cal.App.4th 419, 424.)  "But additional considerations may apply when evidence other than felony convictions is offered for impeachment.  In general, a misdemeanor—or any other conduct not amounting to a felony—is a less forceful indicator of immoral character or dishonesty than is a felony.  Moreover, impeachment evidence other than felony convictions entails problems of proof, unfair surprise, and moral turpitude evaluation which felony convictions do not present.  Hence, courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value."  (*Wheeler*, *supra*, 4 Cal.4th at pp. 296–297; accord, *People v. Contreras* (2013) 58 Cal.4th

14

123, 157, fn. 24.)  We next consider whether the court abused its discretion in admitting the evidence of defendant's misdemeanor misconduct.

*Analysis*

Defendant argues the court's change-of-heart ruling was an abuse of discretion because the court (1) mischaracterized its prior ruling as merely "mulling over" the admissibility of the misdemeanor conduct to impeach his interrogation statement; (2) misconstrued defendant's statement during police questioning as "a claim [he] was a 'peaceful person' "; and (3) misrecalled defendant's testimony about retribution.

In our view, the trial court's initial ruling on impeachment was not tentative.  The court definitively stated it would admit the prior felonies for impeachment, but not the misdemeanor misconduct.  The court stated *no fewer than three times* that defendant's misdemeanor conduct was not admissible as impeachment because the probative value of the evidence was substantially outweighed by the probability that its admission would create substantial danger of misleading the jury.  First, after the prosecution rested, the court stated:  "[U]nder [Evidence Code section] 352, *I'm not going to allow that* [*section*] *12020 to be used, because I think that here they are getting too similar given the knife wounds to the incident offense, and that the jury might be misled by it*."  (Italics added.) Second, after further argument, the court reiterated:  "Well, *I'm not going to be using it for impeachment,* but I am going to take it into consideration as to whether the burglary should be used to impeach."  (Italics added.)

When the prosecutor continued to argue that if defendant testified, the facts underlying the two felony burglary arrests and the misdemeanor knife possession should be admitted because defendant told the police he "was not into violence . . . [and did not] have a violent record at all," the court seemingly took under submission ("*I'm going to wrestle with*" (italics added)) the separate question "whether his statement . . . that he's a peaceful person allows the District Attorney to get into the facts underlying that particular crime."  However, *after* making that statement, the court ruled, for the third and

15

final time before defendant testified: "Anyway, I'm going to rule that both prior felony convictions can be used to impeach. *And I'll find that under* [*Evidence Code*] *section 352, that although the conviction for the misdemeanor* [*Penal Code section*] *12020*[*, subdivision*] *(a)(4) is a crime of moral turpitude, in my opinion that for credibility purposes, that its use is outweighed by the substantial degree of prejudice that Mr. Hall would suffer if it was used, which is not to say if Mr. Hall does testify, he better be careful about how he testifies with regard to his statement to the police that he's a peaceful person.*" (Italics added.)

At the outset, we observe the trial court's ruling excluding evidence of the misdemeanor knife incident for impeachment purposes was appropriate, given the evidence in this case. The pathologist testified that Bradley was stabbed 16 times, the largest wound was four inches long and could have been caused by a blade three and one-half to four inches long with a square edge. As the trial court astutely observed, "I'm not going to allow that [section] 12020 to be used, because I think that *here they are getting too similar given the knife wounds to the incident offense, and that the jury might be misled by it.*" This reflects a valid exercise of Evidence Code section 352 discretion.

It is true defendant did not literally claim to be a peaceful person in response to police questioning. However, he told police he had no violent record whatsoever, did not like violence, and did not like people who were violent. Defendant's statement to Sergeant Sanchez left the impression he was a peaceful person. If defendant had stated or implied in his direct testimony that he was a peaceful person, the prior knife incident may have been admissible to *rebut* that specific claim. However, "not '*any* evidence introduced by defendant of his "good character" will open the door to *any and all* "bad character" evidence the prosecutor can dredge up.' [Citation.] Rather, 'the scope of rebuttal must be specific, and evidence presented or argued as rebuttal must relate directly to a particular incident or character trait defendant offers in his own behalf.' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1174, quoting *People v. Rodriguez* (1986)

16

42 Cal.3d 730, 792, fn. 24; see *People v. Taylor* (Mich. 1985) 373 N.W.2d 579, 581, 584–585.)

As the Attorney General agreed at oral argument, defendant's "peaceful person" statement to Sanchez was not raised in his direct testimony. Thus, the question is whether it was permissible for the prosecution to rebut defendant's implied assertion of a character for peacefulness *to Sanchez* with its opposite, a character for violence. We hold it was not.

Defendant's character for violence was not relevant to any legitimate issue at trial, and *he* did not put his character for peacefulness at issue. In general, evidence of a defendant's character or a trait of his character—that is, his propensity or disposition to engage in a certain type of conduct—is not admissible to prove his conduct on a specific occasion. (Evid. Code, § 1101, subd. (a).) However, when a defendant offers evidence of his good character "to prove his conduct in conformity with such character or trait of character," the prosecution may offer evidence to rebut it. (Evid. Code, § 1102, subds. (a), (b).) " 'When a defendant places his character at issue . . . , the prosecution is entitled to respond with character evidence of its own.' " (*People v. Simon* (2016) 1 Cal.5th 98, 145, quoting *People v. Loker* (2008) 44 Cal.4th 691, 709.) But in this case, *defendant* did not introduce evidence putting his character for peacefulness in issue. That evidence was introduced by the *prosecution* in its case-in-chief by way of defendant's taped statement to police. Evidence Code section 1102 "allows the prosecution to present relevant opinion evidence regarding a defendant's character, but *only* when the defendant has first offered evidence placing his character in issue." (*People v. McFarland* (2000) 78 Cal.App.4th 489, 494, italics added; see *People v. Pangelina* (1984) 153 Cal.App.3d 1, 8; *People v. Terry* (1970) 2 Cal.3d 362, 400.) In other words, Evidence Code section 1102 prevents the prosecution from knocking down a straw man of its own making. Moreover, Evidence Code section 1102, subdivision (b) allows the prosecution to introduce character evidence in the form of opinion or reputation evidence only, not

17

specific acts of misconduct such as prior convictions or the facts underlying them. (*People v. Wagner* (1975) 13 Cal.3d 612, 619.) To the extent the trial court here concluded, after mulling it over, that defendant's implied statement to police "he's a peaceful person allows the District Attorney to get into the facts underlying that particular crime," the court abused its discretion under Evidence Code sections 1101 and 1102.

Although evidence of defendant's character for violence, or propensity to use knives, was not admissible to prove he acted in conformity with that character or propensity, once defendant chose to testify, his credibility did become an issue at trial and was subject to impeachment. Due to "the substantial degree of prejudice that Mr. Hall would suffer if it was used," the court had ruled out impeachment with defendant's misdemeanor misconduct, unless the defendant was careless "about how he testifies with regard to his statement to the police that he's a peaceful person." In reversing its ruling, the court indicated defendant's testimony that he was " 'deterred by fear' . . . of the police" created "an implication of one being a peaceful, nonaggressive person" and "the credibility of that impression, if you like, is justifiable evidence for the prosecution to adduce if the prosecution has it."

Defendant argues nothing in his testimony " 'open[ed] the door' " to impeachment about his "character or truthfulness about his character" and we agree. Defendant's testimony admitted he had lied to the police and explained he did so because he was afraid of retribution. He admitted he had used methamphetamine in the past.[7] He admitted he had prior felony convictions for burglary. Notably, he did not claim to be a peaceful person, did not claim a lack of violent prior convictions, and did not claim to dislike violence or violent people. We do not see how his testimony that he was deterred

---

[7] The Attorney General does not argue that defendant's testimony about his past methamphetamine use opened the door to impeachment with the misdemeanor misconduct.

by fear from coming forward left intact the impression—however irrelevant—that he was in fact a peaceful, nonaggressive person, the truthfulness of which was therefore fair game for impeachment.

As the court's original ruling recognized, the probative value of the misdemeanor conduct was outweighed by its potential to mislead the jury and prejudice defendant. Given the nature of the evidence—that defendant exhibited a knife and verbally threatened to use it against a person at the BART station—the danger here was that the jury would misuse the evidence to infer that defendant had a propensity to carry knives and threaten people with them, and was therefore more likely than not the person who stabbed Bradley to death. It is true the court did not instruct the jury that it could consider the knife possession evidence to show propensity or identity. It is also true the court did not instruct the jury it could *not* consider the evidence for those purposes. Instead, the court instructed the jury the evidence was relevant to evaluate defendant's credibility, and left it up to the jury to decide how the evidence affected the believability of his testimony.[8] Evidence Code section 352 requires the court to balance the probative value against its potential for prejudice or confusion. We see nothing in defendant's direct testimony that (a) enhanced the probative value of misdemeanor misconduct, which the court had previously deemed negligible compared to its prejudicial impact, or (b) diminished the potential for mischief and misuse, which the court had previously deemed substantial. After defendant testified, the balance evidently shifted, but the record fails to illuminate what had changed: the misdemeanor misconduct evidence did not contradict any statement defendant made on the stand, or to the police, and it

_____

[8] The court gave CALCRIM No. 316, which stated: "If you find that a witness has committed a crime or other misconduct, you may consider that fact only in evaluating the credibility of the witness's testimony. The fact that a witness may have committed a crime or other misconduct does not necessarily destroy or impair a witness's credibility. It is up to you to decide the weight of the fact and whether the fact makes the witness less believable."

19

remained highly likely to be misunderstood as propensity and/or bad character evidence. Moreover, defendant's testimony did not enjoy a "false aura of veracity" (*People v. Beagle* (1972) 6 Cal.3d 441, 453) because he was properly impeached with two prior felony convictions for burglary. " 'In general, the trial court is vested with wide discretion in determining relevance and in weighing the prejudicial effect of proffered evidence against its probative value. Its rulings will not be overturned on appeal in the absence of an abuse of that discretion. [Citations.] This discretion is not, however, unlimited, especially when its exercise hampers the ability of the defense to present evidence.' " (*People v. Valencia* (2008) 43 Cal.4th 268, 286; see *Burke v. Almaden Vineyards, Inc.* (1978) 86 Cal.App.3d 768, 774.) In this case, the trial court abused its broad discretion when, after defendant elected to take the stand in reliance on the court's ruling excluding evidence of the 2010 misdemeanor knife incident, the court reversed itself and admitted evidence of the incident, despite repeatedly finding the evidence was likely to prove prejudicial and misleading.

### Timing of Ruling and Denial of Fair Trial

Defendant also argues the timing of the court's ruling infringed on his federal constitutional rights under the Fifth, Sixth, and Fourteenth Amendments. Resolution of the question whether the court's error violates the federal constitution is important, inasmuch as the answer implicates the standard we must use to evaluate whether the error requires reversal. Generally speaking, violations of state evidentiary rules do not rise to the level of federal constitutional error. (*People v. Benavides* (2005) 35 Cal.4th 69, 91; cf. *Estelle v. McGuire* (1991) 502 U.S. 62, 72, 75 [question on federal habeas review is whether state law error " 'so infused the trial with unfairness as to deny due process of law' "].) In *Luce v. United States* (1984) 469 U.S. 38 (*Luce*), the United States Supreme Court indicated in passing that as a matter of federal practice, "even if nothing unexpected happens at trial, the [trial] judge is free, *in the exercise of sound judicial discretion*, to alter a previous *in limine* ruling." (*Luce,* at pp. 41–42; italics added.) Thus,

20

a district court's preliminary ruling on the admissibility of prior conviction evidence for impeachment purposes is not "a question . . . reaching constitutional dimensions." (*Luce*, at p. 43.)

The *Luce* court distinguished *Brooks v. Tennessee* (1972) 406 U.S. 605 (*Brooks*) as a case involving a Fifth Amendment challenge to a state court ruling that dissuaded defendants from testifying. (*Luce*, *supra*, 469 U.S. at p. 42.) In *Brooks*, the Supreme Court invalidated a state procedural rule of timing that required the defendant's testimony to precede that of any other defense witnesses. (*Brooks*, at p. 607.) The court found the rule impermissibly burdened the defendant's right not to testify. "[A] defendant may not know at the close of the State's case whether his own testimony will be necessary or even helpful to his cause. Rather than risk the dangers of taking the stand, he might prefer to remain silent at that point, putting off his testimony until its value can be realistically assessed. Yet, under the Tennessee rule, he cannot make that choice 'in the unfettered exercise of his own will.' [The statute] exacts a price for his silence by keeping him off the stand entirely unless he chooses to testify first. This, we think, casts a heavy burden on a defendant's otherwise unconditional right not to take the stand. The rule, in other words, 'cuts down on the privilege [to remain silent] by making its assertion costly.' " (*Brooks*, at pp. 610–611, fns. omitted.)

The *Brooks* court also found that the rule dictating the timing of the defendant's testimony infringed on his right to due process as defined in *Ferguson v. Georgia* (1961) 365 U.S. 570. (*Brooks*, *supra*, 406 U.S. at p. 612.) In *Ferguson*, the court invalidated a state statute which prevented a criminal defendant from testifying under oath, but not from making an unsworn statement at trial; it also prevented defense counsel from aiding the defendant by asking him questions to elicit the statement. "[T]his limitation deprived the accused of ' "the guiding hand of counsel at every step in the proceedings against him," [citation], within the requirement of due process in that regard as imposed upon the States by the Fourteenth Amendment.' [Citation.] The same may be said of [the

21

Tennessee statute]. Whether the defendant is to testify is an important tactical decision as well as a matter of constitutional right. By requiring the accused and his lawyer to make that choice without an opportunity to evaluate the actual worth of their evidence, the statute restricts the defense—particularly counsel—in the planning of its case. Furthermore, the penalty for not testifying first is to keep the defendant off the stand entirely, even though as a matter of professional judgment his lawyer might want to call him later in the trial. The accused is thereby deprived of the 'guiding hand of counsel' in the timing of this critical element of his defense. While nothing we say here otherwise curtails in any way the ordinary power of a trial judge to set the order of proof, the accused and his counsel may not be restricted in deciding whether, and when in the course of presenting his defense, the accused should take the stand." (*Brooks*, at pp. 612–613.) Applying *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*), the court reversed the conviction and remanded for a new trial. (*Brooks*, at p. 613.)

The precise holding of *Luce* is that a defendant may not challenge the propriety of a ruling on the admissibility of a prior conviction for impeachment if he did not testify at trial. In *People v. Collins* (1986) 42 Cal.3d 378 (*Collins*), our Supreme Court adopted the *Luce* rule as a judicially declared rule of criminal procedure, noting that other states had followed suit.[9] (*Collins*, at p. 385 & fn. 5.) Although the district court in *Luce* actually ruled on the defendant's motion to exclude his prior convictions before he decided not to testify (*Luce*, *supra*, 469 U.S. at pp. 39–40), some state courts have inferred that a trial court's decision to *defer* ruling on the admissibility of a prior conviction for impeachment until after the defendant testifies "does not impermissibly chill the defendant's right to testify" and "does not present a question of constitutional dimension." (*Dallas v. State* (Md.Ct.App. 2010) 993 A.2d 655, 663–664, and see cases cited.)

---

[9] The rule has no application here, since defendant testified.

22

Other jurisdictions have rejected the *Luce* approach and adopted the view that refusing to rule on the admissibility of a prior conviction for impeachment, or reversing a ruling that had excluded the evidence after the defendant takes the stand, at a minimum constitutes an abuse of discretion, and also impairs important constitutional protections, including the right to testify, the right not to testify, and the effective assistance of counsel concerning the exercise of those rights.

For example, in *Apodaca v. People* (Colo. 1985) 712 P.2d 467 (*Apodaca*), the trial court refused to rule in advance of the defendant's testimony on whether the defendant's prior military conviction for rape was unconstitutionally obtained and therefore inadmissible for impeachment purposes. (*Apodaca*, at p. 469.) The defendant presented two witnesses but did not testify in his own defense. (*Apodaca*, at p. 470.) Because *Luce* involved only a federal rule of procedure and not a constitutional issue, the *Apodaca* court found the *Luce* rule barring appellate review "neither compelling nor applicable" when the defendant raises "an issue of constitutional dimension—that is, whether the trial court's refusal to rule on the defendant's motion to prohibit prosecutorial use of prior conviction evidence until such time as the prosecution actually sought to impeach the defendant constituted an impermissible burden on the defendant's constitutional right to testify in his own defense." (*Apodaca*, at p. 473, fn. 9.)

Citing *Brooks, supra*, 406 U.S. 605, the *Apodaca* court found the trial court's refusal to rule on the defendant's motion before he testified violated the accused's fundamental due process rights under both the federal and state constitutions to testify in his own defense. The court also found the error warranted reversal. "A constitutional right may be said to be impermissibly burdened when there is some penalty imposed for exercising the right. [Citations.] An accused's right to testify in his own defense clearly includes the right to tell his story to the jury without being subjected to impeachment by a conviction obtained in violation of constitutional rights. [Citations.] [¶] . . . [¶] A timely judicial ruling on a defendant's motion to suppress prior conviction evidence for the

23

purpose of impeachment serves the vital function of providing the defendant with the meaningful opportunity to make the type of informed decision contemplated by the fundamental nature of the right to testify in one's own defense. The trial court deprived the defendant of that opportunity when it refused to rule on the defendant's motion . . . . We conclude that the trial court's refusal to timely rule on the defendant's motion impermissibly burdened the defendant's exercise of his constitutional right to testify in his own behalf, and that, given the present state of the record, we cannot treat this error as harmless." (*Apodaca*, *supra*, 712 P.2d at p. 473.)

In *People v. Sangster* (1983 Mich.Ct.App.) 333 N.W.2d 180 (*Sangster*), the defendant filed a motion in limine to exclude evidence of his four prior convictions for impeachment purposes. The trial court ruled the evidence would not be admissible but left the door open for the prosecutor to raise the issue again during trial "if the circumstances warranted." (*Id.* at p. 182.) In reliance on this ruling, Sangster testified. (*Ibid.*) After completion of his direct testimony, the prosecutor moved to impeach the defendant and the trial court granted the motion. The *Sangster* court reversed and remanded for a new trial (*ibid.*), reasoning: "As a general rule, a trial court may not reserve its ruling on a motion to suppress evidence of prior convictions until the defendant has completed his testimony but must rule on the motion immediately. A defendant's decision whether or not to take the stand typically hinges upon the trial court's disposition of a motion to suppress evidence of prior offenses. How, then, can a defendant and his attorney plan effective trial strategy when they do not know whether the prosecution will be permitted to tell the jury that the defendant is a convicted felon? [¶] . . . [¶] . . . Nothing in the record supports the trial court's sudden change of heart. Sangster did not testify that he had a clean record or that he had never possessed a gun. He simply gave his own version of the facts. We hold that the trial court abused its discretion in deciding to permit impeachment by evidence of prior convictions after Sangster had already testified." (*Sangster*, at p. 183, fn. omitted.)

24

In *People v. Patrick* (2009) 908 N.E.2d 1 (*Patrick*), the defendant filed an in limine motion seeking exclusion of his prior convictions for impeachment. The trial court refused to rule on the motion prior to the defendant testifying, stating it did not give advisory opinions. Defendant renewed his motion before testifying, but the court again refused to rule, citing its policy of not giving advisory opinions. The defendant testified, and his testimony was impeached with three prior convictions. (*Patrick*, at pp. 3–4.) The Illinois Supreme Court found the trial court's blanket policy of refusing to rule on the admissibility of the defendant's prior convictions not only an abuse of discretion (*Patrick*, at p. 8), but also an error of constitutional magnitude. (*Id.* at pp. 8–9.) "A criminal defendant's right to testify on his own behalf, or not to testify at all, is rooted in the fifth, sixth, and fourteenth amendments of the United States Constitution. [Citation.] A defendant's decision whether to testify is an important tactical determination. [Citation.] A defendant who chooses to testify faces serious risks of impeachment and may open the door to otherwise inadmissible evidence. [Citation.] The decision to testify ultimately belongs to the defendant but is generally made after consultation with counsel. [Citation.] Making the important decision to testify without an opportunity to evaluate the actual strength of the State's evidence restricts the defense in planning its case. [Citation.] [¶] Obviously, defendants benefit from rulings on the admissibility of their prior convictions made before they decide to testify. First, early rulings provide defendants with the information necessary to make the critical decision whether to testify on their own behalf and to gauge the strength of their testimony. [Citation.] Second, early rulings permit defendants and defense counsel to make reasoned tactical decisions in planning the defense by: (1) informing the jury whether the defendant will testify; (2) portraying the defendant in a light consistent with prior convictions being admitted or not admitted; and (3) anticipatorily disclosing prior convictions during the defendant's direct examination, thereby reducing the prejudicial effect." (*Patrick*, at pp. 5–6.) Applying the

*Chapman* standard, the *Patrick* court found the error was not harmless beyond a reasonable doubt.  (*Patrick*, at p. 9.)

Other states' high courts have found trial court error in the refusal to rule on the admissibility of a defendant's prior convictions for impeachment until after he or she testifies, absent some compelling reason.  (See *Settles v. State* (Miss. 1991) 584 So.2d 1260, 1265; *State v. Ritchie* (Vt. 1984) 473 A.2d 1164, 1165.)  And, in *State v. McClure* (Or. 1984) 692 P.2d 579), where the trial court denied the defendant's in limine motion to exclude a prior conviction for impeachment and the defendant decided not to testify (*id*. at p. 582), Oregon's high court stated:  "We believe trial courts should rule on the admissibility of prior crime impeachment evidence as soon as possible after the issue is raised.  It is only after a ruling on the admissibility of a conviction that the prosecutor and defense counsel can make an informed decision how to effectively try the case.  The decision has a significant impact on what questions to ask the jurors during voir dire, what to say in opening statements and the questioning of witnesses.  Whether the defendant takes the stand changes the entire complexion of the case."  (*McClure*, at p. 583.)

Our Supreme Court has never squarely decided whether the refusal to rule on an in limine motion to exclude prior convictions for impeachment is an abuse of discretion or an undue burden on the exercise of the defendant's constitutional rights.  In *People v. Washington* (1989) 211 Cal.App.3d 207 (*Washington*), Division Two of this court stated it was both unusual and undesirable to postpone a ruling on a motion to exclude the use of prior convictions for purposes of impeachment until after a defendant testifies. (*Washington,* at p. 211; accord, *People v. Campbell* (1994) 23 Cal.App.4th 1488, 1496, fn. 12.)  Nevertheless, the *Washington* court concluded it is not error to do so, in light of dicta in *Luce* and *Collins* stating that to balance the probative value of a prior conviction against its prejudicial effect, a trial court " ' "must know the precise nature of the defendant's testimony, which is unknowable when . . . the defendant does not testify.' ' "

26

(*Washington*, at p. 213, quoting *Collins*, *supra*, 42 Cal.3d at p. 384, in turn quoting *Luce*, *supra*, 469 U.S. at p. 41.)  Citing many of the same constitutional concerns voiced by other courts, the *Washington* court observed that "neither *Collins* nor *Luce* contains any genuine analysis of the issue whether a trial court should be permitted to postpone a ruling on the admissibility of prior convictions until after the defendant has testified. Nonetheless, we cannot help but conclude that the courts in both cases deliberately permitted such a postponement.  While this is not the customary practice and in our view should not be encouraged, it would exceed our authority to hold that a California trial judge cannot do that which our own high court and that of the United States have manifestly authorized." (*Washington,* at p. 214.)

We do not think *Washington* is the last word on the subject.  It is one thing to postpone a ruling on the admissibility of prior conviction evidence until after the defendant testifies; it is another thing altogether to definitively rule prior conviction evidence *inadmissible*—inevitably influencing how defense counsel advises his client about the choice whether to testify or remain silent—only to completely reverse the ruling after the defendant has made the irrevocable choice to testify.  And the record reflects no basis for the trial court's ruling change.  In our view, the distinction is a critical one that implicates the defendant's right to the effective assistance of counsel, to testify, not to testify, and the overall fairness of the trial.  "When a trial judge makes a clear nontentative ruling on such an issue, the defendant is entitled to rely upon that ruling." (*State v. Latham* (Wn. 1983) 667 P.2d 56, 66.)

In our view, the trial court's belated about-face ruling on the admissibility of extremely prejudicial evidence deprived defendant of the " guiding hand of counsel at every step in the proceedings against him," just as surely as the rule restricting the timing of the defendant's testimony did in *Brooks*, *supra,* 406 U.S. at page 612.  We have no doubt that the trial court's reversal of its previous ruling "placed defense counsel into the untenable position of having to make an *uninformed* tactical decision" about how to

27

advise his client and "forced counsel to make an *uninformed, unintelligent* decision" (*People v. Gonzalez* (2006) 38 Cal.4th 932, 960) about how to minimize the damaging fallout from impeachment evidence that portrayed defendant as a person with a penchant for threatening others with knives, a narrative of criminal misconduct that some jurors may have seen as presaging the offense for which defendant was on trial.

We have no trouble concluding that the court's mid-testimony reversal of its prior ruling impermissibly burdened the defendant's exercise of his right to testify without impeachment by evidence the court had already deemed more prejudicial that probative, deprived him of the right to counsel's intelligent assistance on whether to exercise his rights to testify or not to testify, and impaired his right to a fair trial.

We evaluate evidentiary errors implicating the defendant's Fifth, Sixth and Fourteenth Amendment rights for prejudice under a "harmless beyond a reasonable doubt" standard. (*Chapman, supra*, 386 U.S. at 24; *Neder v. United States* (1999) 527 U.S. 1, 18.) "Certainly error, constitutional error, in illegally admitting highly prejudicial evidence or comments, casts on someone other than the person prejudiced by it a burden to show that it was harmless." (*Chapman*, at p. 24.) The *Chapman* test "require[s] the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Ibid.*; accord, *Neder v. United States*, at p. 15 [under *Chapman*, the test is "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained' "].) Viewing the error here in light of the record as a whole, we cannot make that finding.

The DNA evidence tying defendant to the Bradley murder was entirely circumstantial. DNA consistent with both Bradley and defendant was found on a bloody vest discarded outside at some distance from the body, on a bloody sock found inside a pocket of the vest, and on a broken piece of electrical cord found in Bradley's house. Only defendant's DNA was found on a beanie found inside a vest pocket. Only

28

Bradley's DNA was found on Bradley's fingernails. There were no eyewitnesses. Bradley's neighbors established that Bradley and defendant knew each other. The only other significant evidence was defendant's statement to the police in which he denied knowing Bradley, being in Bradley's house, or recognizing pictures of the vest, beanie, and sock. Defendant's testimony was critical to his defense. He admitted he lied to the police and explained the DNA evidence. He was impeached with two prior felony burglary convictions. The jury should have been permitted to render its verdict on the basis of this properly admitted evidence alone.

Instead, the jury was allowed to hear evidence that the court had already deemed more prejudicial than probative. The prosecutor was allowed to elicit from defendant on cross-examination details of the incident that had not been brought out on direct, such as the admission that he verbally threatened the BART rider, even though defendant had already admitted he displayed the knife in his waistband, and was convicted only of knife possession. The prosecutor also drew forth from defendant a demonstration of the width of the knife and a description of it as a butcher knife 10 or 12 inches long. Then the prosecutor had defendant identify a photograph of the knife from the 2010 incident and published it to the jury.

In *closing argument*, the prosecutor *used* the misdemeanor misconduct evidence, along with his statement to police, to paint defendant as a violent person, not to impeach his credibility. "He's someone that in 2012 was far different than he is today. And in the beginning of his statement to the police, he tells them he's not a violent person. He doesn't like violence. He tells you in court that this knife that he has on him in 2011 almost was like a turkey knife. You remember he testified and described it. And only after he described it, I was allowed to show him the photo and show you the photo."

Respondent's arguments for why we should find the error harmless beyond a reasonable doubt are not convincing. The Attorney General claims "the issue regarding the past offense was minimal," but the record shows the prosecutor pursued the issue of

29

its admissibility relentlessly until the court reversed its ruling, and then argued it to the jury as evidence that defendant was a far different person in 2012 when Bradley was killed than he appeared to be at trial. The Attorney General also claims the evidence was relevant to defendant's *credibility*, but then argues it was relevant to his *character*: "The prosecutor only raised the issue because appellant asserted to investigators that, since being to prison, he turned his life around and he was a peaceful non-violent person." The instruction given in this case did not dispel the likelihood the jury would similarly misconstrue the relevance of the prior misconduct evidence. The error in admitting the evidence of a prior knife-wielding incident that resulted in a misdemeanor conviction, a little more than a year before Bradley's killing, is not harmless beyond a reasonable doubt. Reversal is required.

**The Pathologist's Testimony**

Inasmuch as the admissibility of the pathologist's testimony about Bradley's observable injuries will arise again on retrial, we address defendant's challenge to that testimony. Defendant does not challenge Dr. Ferenc's opinion about the cause of Bradley's death, but does vigorously argue that Dr. Ferenc's testimony about Bradley's observable injuries violated the Evidence Code and his confrontation rights under the federal constitution's Sixth Amendment because Dr. Ferenc did not testify about his own observations; rather, he testified about Dr. Beaver's observations as recorded by Dr. Beaver in the pathology notes and/or report Dr. Beaver wrote.

Defendant acknowledges that our Supreme Court decided in *People v. Dungo* (2012) 55 Cal.4th 608 that statements contained in an autopsy report prepared by a nontestifying pathologist describing that pathologist's anatomical and physiological observations about the condition of a murder victim's body "were not so formal and solemn as to be considered testimonial for purposes of the Sixth Amendment's confrontation right, and criminal investigation was not the primary purpose for recording the facts in question." (*Dungo*, at pp. 621.) Thus, the defendant does not have a right to

30

confront and cross-examine the nontestifying pathologist. (*Ibid*.) The court reaffirmed those views in *People v. Edwards* (2013) 57 Cal.4th 658, 705–706, and indicated it was not persuaded to reconsider *Dungo*. (*Edwards*, at p. 707, fn. 13.) Very recently, in *People v. Perez* (2018) 4 Cal.5th 421 (*Perez*), the high court again declined to revisit *Dungo* because it found the error harmless beyond a reasonable doubt. (*Perez*, at p. 456.) Under *Dungo* and *Edwards*, Dr. Ferenc's testimony here was properly admitted, and there was no error. *Perez* does not change that conclusion. As an intermediate appellate court, we are bound by the holdings in those two cases, whether or not we agree with them. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) We therefore reject defendant's constitutional argument on the merits without further discussion.

Defendant also argues at length that *Dungo* and *Edwards* are at odds with the views expressed in our Supreme Court's opinion in *People v. Sanchez* (2016) 63 Cal.4th 665.[10] The *Perez* court applied *Sanchez* to the problem of the testifying pathologist who did not make the original observations. The *Perez* court concluded that the substitute pathologist's description of the victim's wounds and postmortem condition, taken directly from the original pathologist's report, constituted hearsay under *Sanchez*. (*Perez*, *supra*, 4 Cal.5th at p. 456.) However, the court also concluded: "While [the testifying pathologist] relied on hearsay in forming his opinion, he is permitted to do so under *Sanchez* and Evidence Code section 802. (See *Sanchez*, *supra*, 63 Cal.4th at p. 685 ['Any

_____

[10] We reject respondent's claim that defendant has forfeited his state law and constitutional challenges because he did not make them in the trial court. In 2015, when this case was tried, *Dungo* and *Edwards* supported the admission of Dr. Ferenc's testimony, as did pre-*Sanchez* decisions on expert testimony, such as *People v. Gardeley* (1996) 14 Cal.4th 605, disapproved in party by *People v. Sanchez*, *supra*, 63 Cal.4th at page 608, footnote 13. Since there was no basis for an objection under then existing law, the failure to object is excusable. (*People v. Edwards, supra*, 57 Cal.4th at p. 705.) Prescience on counsel's part is not required to preserve appellate issues.

31

expert may still *rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so.']．)  The jury would have thus heard [his] opinion about the cause of death even if the trial court had denied admission of the challenged hearsay statements. So we conclude that any error was harmless beyond a reasonable doubt." (*Perez*, at p. 457.)

In our view, *Perez* does not dictate reversal on appeal.  However, on retrial, the parties and the court will have the opportunity to revisit the admissibility of Dr. Ferenc's testimony in light of *Sanchez* and *Perez*.

### Ineffective Assistance of Counsel

Defendant argues that *if* his failure to request a limiting instruction on the misdemeanor misconduct evidence, or his failure to object to Dr. Ferenc's testimony, forfeited his appellate claims of error in the admission of the evidence, then counsel rendered ineffective assistance of counsel.  (*Strickland v. Washington* (1984) 466 U.S. 688, 696.)  Counsel did not forfeit appellate review of defendant's claims, and we have addressed them on the merits.  There was no ineffective assistance of counsel.[11]

## DISPOSITION

The judgment is reversed.

---

[11] In light of our disposition, we do not address defendant's argument, raised in his reply brief, that cumulative prejudice requires reversal.

32

_____
Dondero, J.

We concur:


_____
Margulies, Acting P. J.


_____
Banke, J.

*A147923  People v. Hall*

33

Trial Court:          Alameda County Superior Court

Trial Judge:          Hon. Allan D. Hymer

Counsel:

Alan Siraco, under appointment of the Court of Appeal under the First District Appellate Project, Independent Case System, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler and Jeffrey M. Laurence, Assistant Attorneys General, Catherine A. Rivlin and Sara Turner, Deputy Attorneys General, for Plaintiff and Respondent.

*A147923  People v. Hall*

34